1
2
3
4
5
6
7
8                UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11   | ADAM WEITSMAN; UPSTATE                Case No.: 19-CV-461 JLS (AHG)
12   | SHREDDING, LLC, a New York limited
     | liability company; WEITSMAN          **ORDER (1) GRANTING IN PART**
13   | SHREDDING, LLC, a New York limited   **PLAINTIFFS' REQUEST FOR**
     | liability company; and WEITSMAN      **DAMAGES; AND (2) GRANTING IN**
14   | RECYCLING, LLC, a New York limited   **PART PLAINTIFFS' REQUEST FOR**
     | liability company,                   **A PERMANENT INJUNCTION**
15
                             Plaintiffs,    (ECF Nos. 98, 99, 103, 104, 108)
16
17   v.

18   ROBERT ARTHUR LEVESQUE, III,

19                          Defendant.

20

21          Presently before the Court are Plaintiffs Adam Weitsman; Upstate Shredding, LLC;

22   Weitsman Shredding, LLC; and Weitsman Recycling, LLC's (collectively, "Plaintiffs")

23   Third Supplemental Brief in Support of Motion for Default Judgment and Injunction ("3d

24   Supp. Br.," ECF No. 98), Amended Third Supplemental Brief in Support of Motion for

25   Default Judgment and Injunction ("Am. 3d Supp. Br.," ECF No. 99), Fourth Supplemental

26   Brief in Support of Motion for Permanent Injunction ("4th Supp. Br.," ECF No. 103), Fifth

27   Supplemental Brief in Support of Motion for Permanent Injunction ("5th Supp. Br.," ECF

28   No. 104), and Sixth Supplemental Brief in Support of Motion for Permanent Injunction

("6th Supp. Br.," ECF No. 108).  Also before the Court is Plaintiffs' Notice of Lodging ("Not. of Lodging," ECF No. 94), attached to which is Plaintiffs' Proposed Order Granting Permanent Injunction ("Proposed Order," ECF No. 94-1).

The Court initially vacated the hearing on this matter and took it under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  *See* ECF No. 101.  However, after Plaintiffs requested a status conference in their Fifth Supplemental Brief, the Court held a hearing on November 5, 2020,[1] after which the Court again took this matter under submission.  *See* ECF No. 106.  Having carefully reviewed Plaintiffs' pleadings, briefs, supporting evidence, and the law; considered the Parties' arguments during the November 5, 2020 hearing; and weighed the relevant factors, the Court **GRANTS IN PART** Plaintiffs' damages requests and **GRANTS IN PART** Plaintiffs' request for permanent injunctive relief, as follows.

## BACKGROUND

The Parties are familiar with the relevant allegations, evidence, and procedural history of this case.  For the sake of brevity, the Court incorporates the thorough Background section contained in its February 14, 2020 Order, *see* ECF No. 97 at 2–7, and sets forth below only the new evidence and developments in the case.

On June 7, 2019, Plaintiffs requested that the Clerk of the Court enter default as to Defendant, *see* ECF No. 86, and the Clerk entered default on June 7, 2019, *see* ECF No. 87.  On July 8, 2019, Plaintiffs filed a motion for default judgment.  *See* ECF No. 89

---

[1] The Court notes that Defendant appeared at the November 5, 2020 hearing.  *See* ECF No. 106.  During the hearing, Plaintiffs' counsel questioned whether Defendant had a right to participate in the hearing. The Court believes Defendant did have the right to appear at and participate in a hearing concerning the issue of damages after entry of default judgment.  *See, e.g.*, *Rubicon Glob. Ventures, Inc. v. Chongqing Zongshen Grp. Imp./Exp. Corp.*, 226 F. Supp. 3d 1141, 1147 (D. Or. 2016) (citing B. Finberg, Annotation, *Defaulting Defendant's Right to Notice and Hearing as to Determination of Amount of Damages*, 15 A.L.R.3d 586 (1967); *Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974); *Oire Or. C, LLC v. Yaldo*, No. CV 08-724-ST, 2008 WL 5071709, at *1 (D. Or. Nov. 25, 2008)).  At any rate, Defendant offered no evidence on the issue of damages and spoke only to liability, which has already been determined. Accordingly, whether or not Defendant had participated in the November 5, 2020 hearing, the Court's disposition of this matter would have been the same.

("Default Mot."). Plaintiffs filed supplemental briefs on August 22, 2019, and January 13, 2020. *See* ECF Nos. 90, 95. Defendant did not oppose the Default Motion.

On February 14, 2020, this Court issued its Order (1) Granting in Part and Denying in Part Plaintiffs' Motion for Default Judgment, (2) Denying Without Prejudice Plaintiffs' Request for a Permanent Injunction, and (3) Denying as Moot Plaintiffs' Request for an In-Person Status Conference. *See* ECF No. 97. The Court determined it had jurisdiction over this matter, *see id.* at 8–11, and, after weighing the factors set forth in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986), the Court granted Plaintiffs' request for default judgment as to their first cause of action for defamation and defamation per se but denied Plaintiffs' motion as to their remaining causes of action, *see* ECF No. 97 at 11–20.

As part of their Default Motion, Plaintiffs sought a permanent injunction "prohibiting Defendant from publishing any more False Statements and compelling him to remove all existing False Statements."[2] Default Mot. at 13 (citing ECF No. 85 ("FAC") at Prayer ¶ A). Plaintiffs' First Amended Complaint ("FAC") also sought general, special, and punitive damages, *see* FAC at Prayer ¶¶ C–E, but Plaintiffs indicated their intention to brief that issue separately. *See* Default Mot. at 1, 9–10, 11, 17. The Court concluded that it could not determine on the record as it existed, without Plaintiffs having quantified their damages, whether those damages would provide an adequate remedy at law. ECF No. 97 at 22. Further, the Court indicated it had concerns about the constitutionality of a permanent injunction restraining future speech. *Id.* Accordingly, the Court denied without prejudice Plaintiffs' requested injunction and set a briefing schedule for a supplemental motion concerning Plaintiffs' requests for damages and injunctive relief. *Id.* at 23.

In accordance with the Court's February 14, 2020 Order, Plaintiffs filed their Third Supplemental Brief on February 27, 2020. *See* ECF No. 98. On February 28, 2020, they
/ / /

---

[2] Plaintiffs' First Amended Complaint defines "False Statements" as "all of the false and defamatory statements quoted or otherwise described above." ECF No. 85 ¶ 30. This Order further addresses and defines the "False Statements" *infra* at 29–30.

filed an Amended Third Supplemental Brief.  *See* ECF No. 99.[3]  In the Amended Third Supplemental Brief, Plaintiffs seek (1) a permanent injunction, (2) general/presumed damages in the amount of $800,000; and (3) punitive damages in the amount of $200,000.  *Id.* at 2.  Plaintiffs submit three declarations to support these requests.

The Declaration of Adam Weitsman (ECF No. 99-1, "Weitsman Decl.") avers that all of the False Statements published by Defendant are false and defamatory.  *Id.* ¶ 5.  Defendant has directed these False Statements to local and national news and media agencies, the New York State Police, the Federal Bureau of Investigations, NBC, the Crime Watch Daily, industry groups, and Mr. Weitsman's competitors via "tagging."  *Id.* ¶ 6.  "[L]ikely several hundred thousands and potentially millions" of people have seen Defendant's publicly viewable False Statements over the past four years.  *Id.*

"The scrap metal industry generally relies approximately 90% on reputation and the remaining 10% on price."  *Id.* ¶ 9.  But many scrap metal vendors have stopped doing business with Plaintiffs since Defendant began publishing the False Statements, despite not making any complaints about service or price-related issues.  *Id.* ¶ 12.  And while Mr. Weitsman formerly received "numerous industry awards in the past," he has not since Defendant began publishing the defamatory statements.  *Id.* ¶ 11.  At least three of Plaintiffs' largest competitors are aware of the False Statements, and one of Plaintiffs' main competitors printed the False Statements out and distributed them to Plaintiffs' customers.  *Id.* ¶ 8.  In light of the foregoing, Mr. Weitsman believes people within his industry, both locally and nationally, "believe some or all of the false statements."  *Id.* ¶ 13.

Mr. Weitsman and his family genuinely fear for their lives in light of Defendant's acts, which include posting pictures of Mr. Weitsman's wife and minor children and making public threats.  *Id.* ¶ 14.  They have cut down on their family vacations due to "Defendant's defamation campaign."  *Id.* ¶ 17.  Mr. Weitsman also has become less social

---

[3] It appears that the two briefs are substantively identical, but the Amended Third Supplemental Brief contains tables of contents and authorities.  *Compare* ECF No. 98 *with* ECF No. 99.  Accordingly, the Court will cite to the Amended Third Supplemental Brief throughout this Order.

19-CV-461 JLS (AHG)

as a result, and for more than a year he completely disengaged from social media and stopped going out socially in public. *Id.* ¶¶ 15, 17. Mr. Weitsman "ha[s] suffered and will continue to suffer public humiliation, extreme emotional distress, anxiety, depression, stomachaches, headaches, muscle pain, lack of sleep, lack of desire to eat, emotional pain and suffering, anguish, and loss of self-esteem." *Id.* ¶ 15. He has seen medical professionals for both "physical ailments and stress caused by Defendant's years of daily torment online," and he has incurred expenses as a result. *Id.* ¶ 21. For more than three years, Mr. Weitsman "ha[s] spent the first 5 hours of every day stressing about Defendant's False Statements, who is seeing them, and the damage it was causing [his] reputation." *Id.* ¶ 16. This negative state of mind has impacted his home and marital life. *Id.* ¶ 18.

Despite a temporary order of protection, felony complaint, and arrest warrant, Defendant has not stopped publishing the False Statements. *Id.* ¶ 23. Mr. Weitsman has communicated with Facebook, and it is his understanding that Facebook will not take any action to remove Defendant's False Statements without a permanent injunction. *Id.* ¶ 24. Plaintiffs "have also incurred significant costs for public relations management, Internet search engine optimization costs, and increased pay to employees at [Weitsman Shredding, LLC], in order to identify, defend, and mitigate/defend against Defendant's defamation campaign of 3.5 years." *Id.* ¶ 22.

The Declaration of Stephen J. Donnelly (ECF No. 99-2, "Donnelly Decl.") details some of those public relations expenses. Mr. Donnelly is the president and owner of Dynamic Innovation Group, LLC ("Dynamic"), a public relations company. *Id.* ¶ 4. Plaintiffs' professional relationship with Dynamic started in 2002 but changed significantly in 2016 as a result of Defendant's conduct. *Id.* ¶ 5. Mr. Donnelly has "never seen anything like Defendant's infatuation and attacks on Plaintiffs" in his sixteen years in the public relations industry. *Id.* ¶ 6. Mr. Donnelly's company monitors Defendant's defamatory posts daily, reporting them and contacting websites as needed to assist with Plaintiffs' public relations needs. *Id.* ¶ 7. When Dynamic first began addressing these issues for Plaintiffs, Defendant's "posts were increasingly visible on the Google Search Results

Page," but Dynamic was "relatively successful" in mitigating that harm.  *Id.* ¶ 9; *see also id.* Exs. 1 & 2.

But, the harm extends beyond Plaintiffs' online presence.  *Id.* ¶ 8.  Mr. Donnelly has had to engage in "additional face-to-face, grassroots, local, 'offline' approaches" to put the False Statements to rest.  *Id.*  From June 1, 2018 through February 1, 2020, Plaintiffs have paid Dynamic $128,000 for public relations services solely devoted to addressing Defendant's False Statements.  *Id.* ¶ 10; *see also id.* Ex. 3.  Given the volume of work, Dynamic could easily have charged double its monthly fees, but gave deference to its "lengthy and friendly relationship" with Plaintiffs.  *Id.* ¶ 10.  And, from August 1, 2019 to the present, Dynamic has offered Plaintiffs a "courtesy discount" of $500 per month.  *Id.*

At Dynamic's recommendation, Plaintiffs hired an additional public relations firm, Rosanne Sall Advertising, Inc. ("RSA"), for three months to assist with both the volume of defamatory posts and addressing different contacts at various Internet and media companies.  *Id.* ¶ 11.  Dynamic also recommended a specialty search engine optimization ("SEO") firm, Tarakeet, LLC ("Tarakeet"), to help combat the reputational damage resulting from Defendant's defamatory posts, which Plaintiffs hired for one year.  *Id.* ¶ 12.  Mr. Donnelly does not know how many more years Plaintiffs will require his public relations services or the services of SEOs to reverse the damage caused by Defendant's defamation, but he estimates that two years after Defendant "ceases his defamatory conduct is a reasonable estimate."  *Id.* ¶ 13.

The Declaration of Catherine Johnson (ECF No. 99-3, "Johnson Decl.") details some further expenses Plaintiffs have incurred due to Defendant's False Statements.   Ms. Johnson works in accounts payable at Weitsman Recycling, LLC, "handl[ing] payment for all of the Upstate Shredding branded companies."  *Id.* ¶¶ 2, 5.  Since July 2017, Ms. Johnson has assisted with reviewing and compiling all social media postings by Defendant about Plaintiffs and communicating with law enforcement about them.  *Id.* ¶ 6.  Because this additional work is not within the scope of Ms. Johnson's accounts payable responsibilities, Weitsman Shredding, LLC, has incurred overtime expense for Ms.

Johnson's time spent on this task. *Id.* ¶¶ 8, 9. Based on her time entries and payroll records, Ms. Johnson conservatively estimates that Plaintiffs have incurred $19,797.30 in overtime expenses for this monitoring work. *Id.* ¶ 9; *see also id.* Ex. 1. Ms. Johnson also provides invoices indicating that Plaintiffs have paid $4,500 to RSA and $175,000 to Tarakeet for their public relations and SEO services, respectively. *Id.* ¶¶ 10–12; *see also id.* Exs. 2 & 3.

Based on Ms. Johnson's monitoring of Defendant, she believes he "is enrolled in a bachelor's degree program for digital media at Platt's College in San Diego, California," and is actively seeking employment but unemployed. *Id.* ¶ 15. She has noticed the effect Defendant's False Statements have had on Mr. Weitsman, who has "become withdrawn at the office," "exhibit[s] an increase in stress levels at the office," and has "slowly turned away from visiting potential customers and vendors, due to the embarrassment" he has experienced. *Id.* ¶ 13. Ms. Johnson lives about 45 minutes away from Owego in Binghamton, New York, but on several occasions, when wearing a "Weitsman" or "Upstate Shredding" shirt, she has been approached by strangers asking if Mr. Weitsman really killed a woman or sells drugs. *Id.* ¶ 14.

On May 21, 2020, Plaintiffs filed a Fourth Supplemental Brief. *See* ECF No. 103. The Fourth Supplemental Brief is accompanied by the Declaration of Catherine Johnson in Support of Fourth Supplemental Brief in Support of Motion for Permanent Injunction (ECF No. 103-1, "Supp. Johnson Decl."). Ms. Johnson attaches as exhibits five recent defamatory posts she discovered during her regular monitoring of Defendant's False Statements. *See id.* ¶ 3. Plaintiffs claim that these threats and defamatory communications to law enforcement personnel demonstrate the urgency and necessity of granting permanent injunctive relief. *See* 4th Supp. Br. at 2, 4.

The first post reads: "Hey Weitsman, you know, they say never to take delight in the suffering of one's enemies. But what we are about to do to you, I'm going to savor every single moment of it." 4th Supp. Br. at 2 (emphasis omitted); Supp. Johnson Decl. Ex. 1. ///

7

The second post, from May 10, 2020, reads:

> Currently planning to travel to New York where I will be filming one of Adam Weitsman's human trafficking victims.  It is with full certainty that I will be traveling back to New York and should be there on June 5th.  I will begin to prepare myself, mentally, physically and financially.  "WITH GREAT HOPE" I intend to film as many people as possible that are willing to be filmed, those that are willing to come forward.  This will be a documentary that focuses predominantly on Adam Weitsman and the mob that supports him in drug/steroids/human trafficking.  Anyone that has spoken to me before has an opportunity to be filmed, if they so choose.  There will be many revelations, some of which, even I am shocked having listened.  Truly mind blowing things.  Things that even seem relatable to Jeffery Epstein.

4th Supp. Br. at 3 (emphasis omitted); Supp. Johnson Decl. Ex. 2.

The third post, from May 2, 2020, notes that Defendant posted a statement to the Spencer Police Department's Facebook page, which Spencer Police Chief Monteiro deleted.  Supp. Johnson Decl. Ex. 3.  In the post, Defendant claims that "Monteiro tried to intimidate me," and told him "to stop talking about Adam Weitsman's involvement in drug/ steroid /child trafficking" and "that he and his friends would have [Defendant] arrested for harassment."  *Id.*  Defendant states that "Spencer Police Department receives a lot of cash, directly from Weitsman.  None of the donations have been reported."  *Id.*  He speculates "that Spencer Police Department are more actively in charge of protecting Weitsman's drug trafficking."  *Id.*  He also notes, "I see that Spencer Police Chief Monteiro was unable to delete my review of his 'Police' Department.  It is relatively identical to the comment I left on his post, in which he speaks about receiving donations from Drug Dealer/ Steroid Dealer/ Child Pornographer Adam Weitsman."  *Id.*

The fourth post, dated May 4, 2020, indicates that Defendant "[s]poke to Investigator Parker" in the Owego Police Department about "his employee[]s['] involvement in protecting local drug/ steroid/ child trafficking."  Suppl. Johnson Decl. Ex. 4.

///

Finally, the fifth post, from the same day, indicates that Defendant "just got off the phone with the Mayor of Spencer." Supp. Johnson Decl. Ex. 5. Defendant claims that the former Owego Police Chief, Karen Vinti, after retiring from the police force and going to work as Mr. Weitsman's Chief of Security, "was using her Police connections and her role as the former Police Chief to silence me about her employer's (Adam Weitsman) involvement in drug/ steroids/ human trafficking." *Id.*

On October 23, 2020, Plaintiffs filed their Fifth Supplemental Brief. *See* ECF No. 104. The Fifth Supplemental Brief requests: (1) that certain amounts previously submitted in support of Plaintiffs' request for general damages be awarded as "actual damages," (2) that the Court award double the previously requested general damages, (3) that the Court award double the previously requested punitive damages, and (4) that the Court schedule a conference "at the earliest date available, so that Plaintiffs can emphasize the seriousness of the relief requested." *Id.* at 2.

In the Fifth Supplemental Brief, Plaintiffs assert that Defendant "has doubled-down on his defamation campaign," *id.*, "ha[ving] published more than 30 statements on his public Facebook profile that repeat statements this Court has adjudicated as defamatory" since June 2020, *id.* at 3. The Declaration of Catherine Johnson in Support of Fifth Supplemental Brief in Support of Motion for Permanent Injunction (ECF No. 104-1, "2d Supp. Johnson Decl.") is accompanied by six exhibits detailing Defendant's defamatory activity since June 2020.

On June 6, 2020, Defendant posted on Facebook that "Adam Weitsman has been the main drug supplier/ human trafficker for over two decades." 2d Supp. Johnson Decl. Ex. 1 at 1. On June 21, 2020, Defendant posted on Facebook that "Drug Trafficker Adam Weitsman . . . and all the other local business owners use the area's black people as his nickel and dime drug dealers." *Id.* at 2. In July 2020, Defendant "published six videos and numerous posts that accuse Plaintiffs of being responsible for the disappearance and death of Michele Harris, and being a trafficker of children and drugs." 5th Supp. Br. at 3 (citing 2d Supp. Johnson Decl. Ex. 2).

Defendant's August 2020 Facebook posts are largely devoted to statements about Mr. Weitsman's alleged trafficking in children.  On August 1, 2020, Defendant posted that "I'm the only one that ever spoke out against Adam Weitsman's drug/ steroids/ bank fraud/ human/ child trafficking enterprise."  2d Supp. Johnson Decl. Ex. 3 at 2.  An August 2, 2020 post referred to Mr. Weitsman as "the main child trafficker."  *Id.* at 3.  An August 11, 2020 post stated: "Adam Weitsman is involved in human trafficking."  *Id.* at 4.  An August 12, 2020 post claimed "that Johnson City is giving Child Trafficker Adam Weitsman special tax privileges."  *Id.* at 5.  An August 16, 2020 post reiterated that Weitsman is "heavily involved in the human trafficking element" and noted that this is a "[v]ery prolific type of story among the #TeamWeitsman mob."  *Id.* at 6.  An August 27, 2020 post, which included a video, stated: "I'd like to know why the #Skaneateles School District is allowing drug/ human trafficker Adam Weitsman and his friends access to children.  Why exactly are convicted felons/ rapists allowed to mentor kids at the high school?  Why is Weitsman allowed to hangout with kids at the elementary school?"  *Id.* at 8.  On August 28, 2020, Defendant posted that "one would be vvvverrryyy surprised to learn where Weitsman has his child trafficking operations and whom are involved in it."  *Id.* at 9.  The same day, Defendant published a second post stating: "It is an absolute shame that New Yorkers allow Adam Weitsman to systematically abuse children for the sake of profit and his own sexual gratification."  *Id.* at 10.

On September 1, 2020, Defendant published a Facebook post claiming:

> In one of those, oh so cringeworthy moments in internet history. Weitsman uses his personal assistant to establish a relationship with Adam Wurth, a guy who says that Weitsman had a role in child sex abuse against him.  This is EXACTLY what Weitsman does.  He uses the public, the media, law enforcement like Karen McBride Vinti, his employees, his friends as his little intelligence agents.  They all provide him with information.  Because again, Weitsman is exactly like Weinstein and Epstein.  Exact same playbook.

/ / /

2d Supp. Johnson Decl. Ex. 3 at 2.  On September 7, 2020, Defendant posted that "Adam Weitsman is associated/ good friends with celebrities that align themselves with his own criminal operations....WHICH AGAIN is major drug/ steroids/ bank fraud/ human and child trafficking." *Id.* at 3.  On September 12, 2020, Defendant stated: "I don't care if Michele's own family have forgotten about her . . . .  I'm going to continue to speak the truth about her murder and the disposal of her body at Upstate Shredding." *Id.* at 4.  This post was accompanied by a link to a YouTube video entitled "Stand Back Remix/ Tribute/ Weitsman vs. Levesque 2019." *Id.*  On September 13, 2020, Defendant stated that Mr. Weitsman "has instead always relied upon illegal crimes like drug trafficking . . . to keep his schemes going." *Id.* at 5.  The same day, Defendant published a post stating: "Weitsman thinks that I don't know about his private air strip(s).  Remember what I said, Weitsman's jet is what imports and exports drugs/ steroids etc." *Id.* at 6.  On September 14, 2020, Defendant posted about Mr. Weitsman's alleged child trafficking again, stating: "Weitsman's human trafficking operations were QUITE organized and large.  One would be shocked at the PA to NYC pipeline alone...... which actually goes through the Southern Tier of New York, with very little fanfare." *Id.* at 7.

On October 15, 2020, Defendant posted that "[l]ittle does the public and the Federal Government know that Weitsman conceals much larger Bank Fraud/ Trafficking schemes." 2d Supp. Johnson Decl. Ex. 5 at 2.  In a separate post on the same day, Defendant stated: "Weitsman's companies never made money, simply a front based upon acquiring Bank loans and to launder drug/ steroids/ human trafficking money." *Id.* at 3.  An October 17, 2020 post reiterated that Mr. Weitsman "is involved with major child abuse." *Id.* at 4.

The Fifth Supplemental Brief is also accompanied by the Declaration of Adam Weitsman in Support of Fifth Supplemental Brief in Support of Motion for Permanent Injunction ("Supp. Weitsman Decl.," ECF No. 104-8).  Mr. Weitsman avers:

> As a result of Defendant's continued publication of the False Statements since the filing of the February 27, 2020 damages

supplement through the date of this supplement: (1) USS continues to spend twenty-five hundred ($2500.00) dollars per month on public relations to address and/or resolve the False Statements to address the impact of Defendant's defamation campaign of four-years; (2) I continue to receive phone calls and text[] messages from personal friends and third parties asking about False Statements, and inquiries from them about why the Defendant is *contacting them* about the False Statements; (3) metal and recycling business insiders continue to read the False Statements, which Defendant continues to post online, and they continue to contact me and other representatives at USS to inquire about the False Statements; (4) certain metal and recycling business contacts, including vendors, continue to refrain from and/or decreased their business with USS; (5) I continue to suffer from social anxiety, and because of my increased stress levels and anguish caused by Defendant's non-stop publication of False Statements, my wife has also been in distress, and my family continues to live in fear for our safety because of Defendant's unstable and bizarre behavior; (6) I have suffered, and will continue to suffer, public humiliation, extreme emotional distress, anxiety, depression, stomachaches, headaches, muscle pain, lack of sleep, lack of a desire to eat, emotional pain and suffering, anguish, and loss of self-esteem; and (7) I am currently in the Maldives on vacation with my family and friends, and the Defendant is publishing the False Statements on Facebook and Instagram, targeting my family and friends while we are here, by publicly asking my friends (on social media) why they are filming "the major drug/ human trafficker Adam Weitsman.  How much is he paying yall?" Consequently, I have not been able to escape the Defendant's defamation campaign, even while traveling overseas.

*Id.* ¶ 6 (emphasis in original).[4]  Mr. Weitsman "continue[s] to spend at least 5 hours of every day stressing about Defendant's False Statements, who is seeing them, and the damage it continues to cause my reputation." *Id.* ¶ 7.

/ / /

---

[4] The post referenced in Mr. Weitsman's Supplemental Declaration is attached as an exhibit to Ms. Johnson's Second Supplemental Declaration.  *See* 2d Supp. Johnson Decl. Ex. 6 at 5–6.

19-CV-461 JLS (AHG)

The Court held a hearing on Plaintiffs' Supplemental Briefs on November 5, 2020. *See* ECF No. 106. Defendant appeared at the hearing but spoke briefly only to the issue of liability and presented no evidence relevant to the damages issues presently before this Court.

On November 16, 2020, Plaintiffs filed a Sixth Supplemental Brief. *See generally* ECF No. 108. Plaintiffs note:

> In the short time since the November 5 hearing, Defendant . . . has resorted to a new level of aggression in his defamation campaign, by directly messaging Adam Weitsman's employees, friends, and others with a link to a new video (created by Defendant) accusing Mr. Weitsman of rape, child sex trafficking, and related crimes.

6th Supp. Br. at 2.

The Sixth Supplemental Brief is supported by the Declaration of Catherine Johnson in Support of Sixth Supplemental Brief in Support of Motion for Permanent Injunction (ECF No. 108-1, "3d Supp. Johnson Decl."). Ms. Johnson indicates that, on November 9, 2020, Defendant posted the following to his Facebook page:

> If today is the last day that I am able to legally remain on the internet. If this was my last post, what would I say? Well none other than that I just found out who(m) are involved with Adam Weitsman in MAJOR CHILD TRAFFICKING. Finally… after all this time, after all these years. I finally found out whom are involved with ADAM WEITSMAN of UPSTATE SHREDDING in organized child trafficking.

*Id.* ¶ 4. On November 12, 2020, Defendant published a publicly available YouTube video titled "Child Trafficking Ring Exposed: La Familia Motorcycle Gang, Bradford County, Adam Weitsman." *See id.* ¶ 5. Ms. Johnson provides screenshots of the video, showing that the video had over 8,950 views within twenty-four hours of publication and 16,459 views with 74 comments as of the filing of the Sixth Supplemental Brief four days later. *See id.* ¶¶ 6–7; *see also id.* Ex. 1. Plaintiffs also submit a transcript of the video prepared by a Certified Reporter. *See id.* Ex. 2. The video contains many statements alleging that

Mr. Weitsman is involved in child, human, and/or drug trafficking, *see id.* at 3, 4, 7, 10, 12, 13, 14; and contends that Mr. Weitsman has raped a child, *see id.* at 3.

The Sixth Supplemental Brief is also accompanied by the Declaration of Adam Weitsman in Support of Sixth Supplemental Brief in Support of Motion for Permanent Injunction ("2d Supp. Weitsman Decl.," ECF No. 108-4). Mr. Weitsman declares that "[he has] received 100s of text messages just like the few exemplars attached to this motion, since November 12th, 2020, when the video was first published," *id.* ¶ 7, and he notes that "[t]his Video has been the most humiliating and damaging publication to me, to date," *id.* ¶ 8. Mr. Weitsman attaches screenshots of fourteen messages he received from various people alerting him to the presence of the video and/or expressing their concern or support. *See id.* Ex. 3. Mr. Weitsman avers that, after the video was published, he "was unable to sleep at all, all weekend, and ha[d] no choice but to continue to address the allegation of child sex trafficking with [his] employees." *Id.* ¶ 9. Mr. Weitsman says he is "drowning in the torrential downpour of mental anguish associated with Defendant Levesque's defamation campaign." *Id.* ¶ 13. In light of the November 12, 2020 video, "Plaintiffs[] reiterate to the Court their request for additional damages, including appropriate punitive damages, requested in their fifth supplemental motion." 6th Supp. Br. at 5.

Defendant has filed no oppositions to Plaintiffs' Supplemental Briefs. *See generally* Docket.

## MONETARY DAMAGES

Upon entry of default judgment, the well-pleaded factual allegations of the complaint are taken as true, except those relating to damages. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (citations omitted); *see also TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). To prove damages, a plaintiff may submit declarations or documentary evidence, or the Court may hold an evidentiary hearing. *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (citations omitted); *see also Taylor Made Golf Co. v. Carsten Sports*, 175 F.R.D. 658, 661 (S.D. Cal. 1997) ("In assessing damages, the court must review facts of record, requesting more

information if necessary, to establish the amount to which plaintiff is lawfully entitled upon judgment by default.").

Under New York law,[5] "[d]efamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002) (citing *Morrison v. Nat'l Broad. Co.,* 19 N.Y.2d 453, 458 (N.Y. 1967)). "Generally, in a defamation action, the prevailing party may seek compensatory damages and punitive damages." *Robertson v. Doe*, No. 05CIV7046LAPRLE, 2009 WL 10676484, at *4 (S.D.N.Y. Dec. 17, 2009), *report and recommendation adopted*, No. 05 CIV 7046(LAP), 2010 WL 11527317 (S.D.N.Y. May 11, 2010), *aff'd sub nom. Robertson v. Dowbenko*, 443 F. App'x 659 (2d Cir. 2011) [hereinafter "*Robertson I*"] (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974); *Smith v. Wade*, 461 U.S. 30, 50 (1983); *Matherson v. Marchello*, 473 N.Y.S.2d 998, 1002 (N.Y. App. Div. 1984)).

Plaintiffs request both compensatory and punitive damages. *See generally* Am. 3d Supp. Br.; 5th Supp. Br.  The Court will address each request in turn.

## I.   Compensatory Damages

Initially, Plaintiffs requested general/presumed damages of "not less than $800,000" to compensate them "for their loss of reputation and the humiliation and mental suffering caused by the defamation and harassment over a period of three-and-a-half years."  Am. 3d Supp. Br. at 9.  However, in their Fifth Supplemental Brief, Plaintiffs revised their request, seeking instead (1) "an award of actual damages as itemized in Plaintiffs' Third

---

[5] Although this action was transferred to this District from New York, the Court continues to apply New York substantive law to Plaintiffs' state law claims, including Plaintiffs' damages requests.  *See, e.g., Ravelo Monegro v. Rosa,* 211 F.3d 509, 513 (9th Cir. 2000) (citing *Ferens v. John Deere Co.,* 494 U.S. 516, 524–25 (1990); *Van Dusen v. Barrack,* 376 U.S. 612, 636–37 (1964)); *Patterson v. Balsamico,* 440 F.3d 104, 119 (2d Cir. 2006) ("A federal court, in reviewing the amount of damages awarded on a state law claim, must apply New York law.") (citations omitted).  Plaintiffs' Supplemental Briefs only assess the issue of compensatory and punitive damages under New York law.  *See generally* ECF Nos. 98, 99.  Nor did any Party assert during the November 5, 2020 hearing a belief that any other law should apply to the compensatory or punitive damages issues before the Court.  Accordingly, the Court only assesses Plaintiffs' compensatory and punitive damages requests under New York law.

19-CV-461 JLS (AHG)

Supplemental [Doc. 98 at 14—17]," and (2) "increased general/presumed damages in the total amount of $1,600,000," for a total of nearly $2 million in compensatory damages.  5th Supp. Br. at 2.

### A. Legal Standard

"The plaintiff in a defamation action may be entitled to two types of compensatory damages: '(1) general damages, which the law presumes to be the natural, proximate and necessary result of the publication; and (2) special damages, which are not presumed to be necessary and inevitable of publication . . . [and] must be shown by allegation and proof.'" *Robertson v. Doe*, No. 05 CIV. 7046(LAP), 2010 WL 11527317, at *2 (S.D.N.Y. May 11, 2010), *aff'd sub nom. Robertson v. Dowbenko*, 443 F. App'x 659 (2d Cir. 2011) [hereinafter "*Robertson II*"] (quoting *Schneider v. Green*, No. 88 CIV. 2931 (MJL), 1990 WL 151142, at *18 (S.D.N.Y. Oct 1, 1990)).  "Under New York law, when, as alleged here, a statement is libelous per se, a presumption of actual damage to reputation arises from the statement itself, thereby entitling the plaintiff to recover general damages." *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 282 F. Supp. 2d 126, 132 (S.D.N.Y. 2003), *as amended* (Oct. 8, 2003) (citing *Hinsdale v. Orange Cnty. Publ'ns, Inc.,* 217 N.E.2d 650, 652 (N.Y. 1966)).

"However, although the existence of compensatory damages is presumed, the quantum of such damages is not." *Gatz v. Otis Ford, Inc.*, 711 N.Y.S.2d 467, 468 (N.Y. App. Div. 2000) (citations omitted).  "The amount of general damages in a defamation action must be supported by competent evidence concerning the injury, but there is no need to produce evidence which assigns an actual dollar value to the injury." *Technovate LLC v. Fanelli*, 20 N.Y.S.3d 295, at *6 (N.Y. Civ. Ct. 2015) (citing *Wolf St. Supermarkets v. McPartland,* 108 A.D.2d 25 (N.Y. App. Div. 1985)).  "In determining the appropriate amount of general damages in a defamation claim, the court generally defers to the victim's pleaded amount because '[b]y the very nature of harm resulting from defamatory publications, it is frequently not susceptible of objective proof.'" *Robertson I*, 2009 WL 10676484, at *4 (quoting *Carey v. Piphus*, 435 U.S. 247, 263 (1978) (citing 1 F. Harper &

F. James, Law of Torts § 5.30, at 468 (1956))).  The defendant's ability to pay is not a relevant consideration in assessing compensatory damages.  *See Rupert v. Sellers*, 368 N.Y.S.2d 904, 909 (N.Y. App. Div. 1975) ("It is clear that with respect to compensatory damages the wealth of either party has no bearing in law.").

Statements falling into any of the four following categories constitute defamation per se of an individual plaintiff, and therefore do not require proof of damages: "(1) statements charging the plaintiff with a serious crime; (2) statements that tend to injure the plaintiff in her trade, business or profession; (3) statements that impute to the plaintiff a 'loathsome disease'; and (4) statements that impute unchastity to a woman." *Nolan v. New York*, 158 A.D.3d 186, 195 (N.Y. App. Div. 2018) (citations omitted).  "Likewise, with regard to business entities, 'statements which impugn the basic integrity, creditworthiness, or competence of the business, are defamatory *per se,* and thus, special damages need not be pleaded.'" *Prince v. Fox Television Stations, Inc.*, 33 Misc. 3d 1225(A), 939 N.Y.S.2d 743 (Sup. Ct. 2011) (quoting *Ruder & Finn Inc. v. Seaboard Surety Co.*, 439 N.Y.S.2d 858, 862 (1981)) (citing *Drug Research Corp. v. Curtis Publ'g Co.*, 199 N.Y.S.2d 33, 37 (1960)), *aff'd in relevant part as modified*, 93 A.D.3d 614 (2012).

### B.   Analysis

Plaintiffs first request their "actual damages."  5th Supp. Br. at 2.  Per Plaintiffs' evidence, through February 2020, Plaintiffs have paid $128,000 to Dynamic, a public relations company, for reputation management and social media monitoring, *see* Donnelly Decl. ¶¶ 4–5, 10, Ex. 3; $19,797.30 in overtime to Ms. Johnson, an employee tasked with compiling and reviewing Defendant's defamatory posts, *see* Johnson Decl. ¶¶ 2, 6, 9, Ex. 1; $4,500 to RSA, a public relations company, for monitoring and addressing the defamatory posts, *see* Johnson Decl. ¶¶ 10–12, Ex. 2; *see also* Donnelly Decl. ¶ 11; and $175,000 to Tarakeet, a specialty search engine optimization firm, to combat reputational damage, *see* Johnson Decl. ¶¶ 10–12, Ex. 2; *see also* Donnelly Decl. ¶ 12.  Thus, in total, as of February 1, 2020, Plaintiffs had expended $327,297.30 combatting Defendant's defamatory statements.  Since then, Plaintiffs have continued to pay $2,500 per month to

Dynamic for public relations services required as a result of Defendant's defamation. *See* Supp. Weitsman Decl. ¶ 6. The last invoice to Plaintiffs noted in Dynamic's records was for February 1, 2020, *see* Donnelly Decl. ¶ 10; *id.* Ex. 3; therefore, the Court concludes that Plaintiffs have paid Dynamic for services related to the defamation for an additional nine months, totaling $22,500, since February 1, 2020. Accordingly, Plaintiffs' "actual damages" to date total at least $349,797.30. The Court concludes that Plaintiffs have adequately proven that they have incurred damages in this amount and awards Plaintiffs this sum.

As to Plaintiffs' request for $1,600,000 in general damages, although damages for loss of reputation, humiliation, and mental suffering are not quantifiable, Plaintiffs have submitted declarations, invoices, and time records to establish the significant injury they have incurred as a result of Defendant's defamatory statements over the past four years. The evidence noted above indicates that Plaintiffs have incurred hundreds of thousands of dollars in expenses combatting the reputational damage caused by Defendant's defamatory statements, from which the Court can and does infer that the reputational harm to Plaintiffs has been great. Further, Mr. Donnelly estimates it will take roughly two years after Defendant is enjoined for the injury to cease, *see* Donnelly Decl. ¶ 13, making hundreds of thousands of dollars more in such expenditures likely. Plaintiffs also submit declarations detailing more anecdotally the reputational and business injuries they have incurred, as well as the impacts on Mr. Weitsman and his family. *See generally* Weitsman Decl.; Donnelly Decl.; Johnson Decl.; Supp. Weitsman Decl.; 2d Supp. Weitsman Decl.; *see also supra* at 4–6, 7, 11–12, 14.

This Court previously determined, in its February 14, 2020 Order, that Plaintiffs had adequately pleaded a claim for defamation per se and were entitled to default judgment on that claim. *See* ECF No. 97 at 12–16. Thus, the Court concludes that Plaintiffs are entitled to general damages for Defendant's per se defamatory statements, to the extent they have provided competent evidence to show injury from Defendant's defamatory statements. And, having reviewed the evidence submitted by Plaintiffs, the Court is convinced that

Plaintiffs have suffered actual and substantial injury as a result of Defendant's defamation. Defendant has been making defamatory statements about Plaintiffs for more than four years. One readily can infer from the fact that Plaintiffs have expended more than $300,000 on public relations and search engine optimization services solely to address Defendant's statements that Plaintiffs' business reputation has been injured, substantially, as a result of the defamation. That many scrap metal vendors have stopped doing business with Plaintiffs since the defamation started, without complaining of service or pricing issues, further supports this inference, *see* Weitsman Decl. ¶ 12, particularly given the extent to which business in Plaintiffs' industry depends upon reputation, *see id.* ¶ 9. Accordingly, the Court finds that Plaintiffs have provided adequate evidence of an actual injury from Defendant's sustained Internet defamation campaign to merit an award of general damages.

The Court was inclined to find the $800,000 originally requested by Plaintiffs for compensatory damages reasonable; however, the Court has some concerns about Plaintiffs' belated request to double that quantum of damages and separately award "actual damages," resulting in a total award of nearly $2 million. Nonetheless, the Court does believe some upward adjustment of the originally requested $800,000 in compensatory damages is appropriate given both the sustained nature of Defendants' defamation campaign, *see, e.g.*, *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 336–44 (S.D.N.Y. 2016) (upholding jury award of $1.5 million in compensatory damages on defamation claim where "[d]efendants engaged in a daily campaign of Internet-based defamation against [p]laintiff that lasted for approximately ten months" and the articles in question "are replete with egregiously defamatory statements about [p]laintiff"), as well as the length of time Plaintiffs' request has been pending before this Court. Having given due consideration to the evidence before it, as well as the factors Plaintiffs urged the Court to weigh, *see* Am. 3d Supp. Br. at 9–18, the Court finds that an award of $600,000 in general damages, in addition to an award of Plaintiffs' actual damages, is appropriate to compensate Plaintiffs for the substantial harm, both emotional and reputational, they have incurred as a result of Defendant's defamation.

Accordingly, the Court **GRANTS IN PART** Plaintiffs' request for compensatory damages. The Court will award Plaintiffs $349,797.30 in actual damages and $600,000 in general damages, for a total award of $949,797.30 in compensatory damages.

## II. Punitive Damages

Plaintiffs also request punitive damages. Originally, Plaintiffs sought punitive damages in the amount of $200,000, Am. 3d Supp. Br. at 20, but Plaintiffs' Fifth Supplemental Brief requested that the Court award double that figure—$400,000—instead, *see* 5th Supp. Br. at 2.

Under New York law, to merit an award of punitive damages for defamation, a non-public figure plaintiff[6] must establish, by a preponderance of the credible evidence, common law malice, which is "hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another or the injurious effects of the defendant's conduct upon another." *Zaidi v. United Bank Ltd.*, 747 N.Y.S.2d 268, 276, 277–78 (N.Y. Sup. Ct. 2002) (citations omitted). Punitive damages are awarded at the discretion of the trier of fact and serve the dual purpose of deterring the libelor as well as serving as a warning to others. *Wachs v. Winter*, 569 F. Supp. 1438, 1444 (E.D.N.Y. 1983) (citations omitted); *see also Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *9 (N.Y. Sup. Ct. June 13, 2002) ("'[W]hether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts.'") (quoting *Nardelli v. Stamberg,* 377 N.E.2d 975 (N.Y. 1978)), *aff'd*, 766 N.Y.S.2d 88 (N.Y. App. Div. 2003). Because "the quantum of damages . . .

---

[6] On the record before it, the Court sees no reason to consider Plaintiffs anything other than private figures. "There is no proof that [P]laintiff[s] ha[ve] achieved general fame or notoriety or 'assumed [a] role[ ] of especial prominence in the affairs of society.'" *Sovik v. Healing Network*, 665 N.Y.S.2d 997, 1000 (1997), *amended on reargument*, 679 N.Y.S.2d 858 (N.Y. App. Div. 1998) (third and fourth alterations in original) (quoting *Gertz,* 418 U.S. at 345). Nor are there indications that Plaintiffs "voluntarily injected [themselves] into the vortex of [the] particular public controversy [at issue] in order to influence its outcome" such that they are "limited purpose public figures." *Id.* (second and third alterations in original) (citations omitted). Any notoriety Plaintiffs have acquired appears to be the result of Defendant's defamation rather than any acts affirmatively undertaken by Plaintiffs.

19-CV-461 JLS (AHG)

[must] be established by proof[, . . .] Plaintiff cannot rely on the well-pleaded allegations of its complaint to support a prayer for punitive damages." *Robertson II*, 2010 WL 11527317, at *6 (citations and internal quotation marks omitted) (first alteration in original).

In New York, "[t]he law as to whether punitive damages can be awarded in cases decided by default judgment is somewhat murky." *Robertson I*, 2009 WL 10676484, at *11. For instance, in *Dubai Bank, Ltd., New York Branch v. Joshi*, the magistrate judge recommended against awarding punitive damages on a claim of defamation won on default, reasoning:

> at some point the realities of this being an award of damages based on a default judgment must be realized. On the one hand, plaintiff should not be penalized because he has won a judgment by default rather than by a trial on the merits. The court is not free to speculate on whether the claim really has merit, but should treat the default judgment as if there has been a decision on the merits. On the other hand, the court recognizes that punitive damages are to be awarded only in cases of malicious actions in gross disregard of a plaintiff's rights.

No. 85 CIV. 5005 (MJL), 1989 WL 168088, at *5 (S.D.N.Y. Aug. 29, 1989); *see also Wachs*, 569 F. Supp. at 1444–45 (noting that, "[s]ince defendant has never appeared in this action, it is difficult to make a determination as to whether or not he acted in good faith or with malice," and concluding, "[s]ince there is very little objective evidence that defendant acted either in bad faith or with malice toward plaintiff, the undersigned recommends that plaintiff not be awarded punitive damages") (citations omitted); *Robertson II*, 2010 WL 11527317, at *5–7 (denying punitive damages on default because, "[w]here, as here, 'there has been no trial of the facts,' there is generally 'no basis for determining how egregious or opprobrious [the defendant's] conduct has been,'" and the plaintiff failed to offer adequate evidence of ill will) (citation omitted).

However, at least one New York court has awarded punitive damages on default judgment on a claim for libel. *See Xiaokang Xu v. Xiaoling Shirley He*, 48 N.Y.S.3d 530,

533–34 (2017) (approving punitive damages award of $5,000 where "defendant has repeatedly harassed plaintiff and his family, attempted to discredit him and damage his reputation, brought numerous suits against plaintiff and his agents, employers and associates and continues to attempt to relitigate issues long since determined").

During the November 5, 2020 hearing, Plaintiffs' counsel conceded that a request for punitive damages on a default judgment is somewhat unusual.  Yet, taking into consideration the evidence submitted by Plaintiffs in support of their Supplemental Briefs, the Court is convinced that it is more likely than not that Defendant defamed Plaintiffs out of common law malice, and accordingly the Court finds that an award of punitive damages is warranted here.  It is reasonable to infer from the evidence before the Court that Defendant's defamatory statements stem from being terminated twice from his employment at a company affiliated with Plaintiffs, given that the posts started shortly after Defendant's termination.  Moreover, the sustained and voluminous nature of the defamatory campaign and Defendant's escalation to outright threats, despite this litigation, strongly indicates that Defendant bears significant ill will toward Plaintiffs that is unlikely to stop without some further deterrent.

Indeed, Defendant mocked Plaintiffs after they sent their demand letter, *see* FAC Ex. D, indicating a willful disregard of the injurious effects of his conduct upon Plaintiffs. *See, e.g.*, *Daniels v. Kostreva*, No. 15 CV 3141 (ARR)(LB), 2017 WL 823583, at *12–14 (E.D.N.Y. Jan. 12, 2017) (recommending punitive damages of $35,000 on default judgment for libel where publication of "damaging and spiteful accusations" online continued over several months, including "information from the emails plaintiff sent to her trying to resolve the matter," as these facts supported "the intentional and malicious nature of defendant's conduct"), *report and recommendation adopted*, No. 15CV3141ARRLB, 2017 WL 519227 (E.D.N.Y. Feb. 8, 2017).  That Defendant has himself posted on social media about defamation, and still continued to defame Plaintiffs, further supports the inference that Defendant is motivated by a strong hatred and a willful disregard of Plaintiffs' rights.  *See* FAC Exs. B, C.  And Defendant's recent posts recognizing that he

may soon be enjoined but continuing to repeat statements that have been deemed defamatory further supports this inference. *See* 3d Supp. Johnson Decl. ¶ 4; *id.* Ex. 2 at 2.

Thus, in light of the truly egregious nature of Defendant's actions, the Court finds some award of punitive damages merited despite the procedural posture of this case. However, the Court is disinclined to grant $400,000 in punitive damages, particularly given Plaintiffs' own statements that they believe Defendant to be an unemployed student working toward a bachelor's degree. Am. 3d Supp. Br. at 19; Johnson Decl. ¶ 15. In light of Defendant's presumed circumstances, a lesser amount seems adequate to punish and deter. *See Micari v. Mann*, 481 N.Y.S.2d 967, 970 (N.Y. Sup. Ct. 1984) (noting factfinder "is entitled to consider [the defendant's financial] condition after an award has been made for compensatory damages") (citations omitted).

Accordingly, this Court, in its discretion and after having reviewed all of the evidence before it, finds an award of $50,000 in punitive damages appropriate.

## PERMANENT INJUNCTION

Finally, Plaintiffs request a permanent injunction. *See* Am. 3d Supp. Br. at 2–7, 18–19; *see also* Proposed Order. Plaintiffs' Proposed Order would permanently bar "Defendant and all those acting under his direction or control" "from publishing or causing the publishing, via internet or any other medium, any of the following false and defamatory statements, whether directly or indirectly, about any of the Plaintiffs," and specifies fifteen statements Defendant has made about Plaintiffs, which Plaintiffs label the "False Statements." Proposed Order at 5–6. The Proposed Order requires Plaintiff to remove the False Statements "from all websites, search engines, forums, blogs, lists, social media websites, and/or other forums of mass communication (collectively 'Forums')" within ten days of the date of the order. *Id.* at 5–6. The Proposed Order also requires Defendant, within ten days, to "immediately remove from all Forums any references, including any partial references, to a False Statement," as well as "any images or photos of Weistman and/or his family." *Id.* at 6–7. The Proposed Order also enjoins Defendant "from posting on any Forum, or encouraging or soliciting others to post on any Forum, any False

Statement, or variation thereof, about any Plaintiff and/or any business entity related thereto," or "any images or photos of Weitsman and/or his family." *Id.* at 8. The Proposed Order further provides:

> To the extent Defendant is unwilling or unable to remove the False Statements within 10 days from the date of this Order, Twitter.com, Facebook.com, Instagram.com, YouTube.com, and/or any other social media platform or Forum should permanently suspend the use of Defendants' account(s) in accordance with its internal rules and policies. . . . To the extent any Forum is unwilling or unable to permanently suspend the use of Defendant's account(s), the Forum shall turn over ownership of the account(s) to Plaintiffs' counsel in order for Plaintiffs to effectuate the relief granted under this Order[.]

*Id.* at 8–9. The Proposed Order indicates that it shall apply "to any and all other Internet URLs which now or hereinafter display, contain, or otherwise publish the same or similar statements decreed and declared herein by this Court to be false and defamatory," specifically "any and all URLs in which the False Statements are now located at or are to be located at on a subsequent date." *Id.* at 9. Finally, the Proposed Order requests that "Google, Yahoo!, Bing, Facebook, Instagram, Twitter, YouTube, and other websites with the same or similar defamatory content about Plaintiffs remove all associated webpages and URLs from their respective search indexes and websites." *Id.* at 9–10.

## I.    **Legal Standard**

Under New York law,[7]

---

[7] Plaintiffs' Supplemental Briefs largely rely on New York case law to support their request for an injunction. *See* Am. 3d Supp. Br. at 3–7. However, during the November 5, 2020 hearing, Plaintiffs' counsel asserted that they believe there is a basis for applying either California law or New York law to their request for injunctive relief. "A permanent injunction, as a method to enforce substantive law rights, 'is an integral component of the [underlying] substantive law right.'" *United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*, No. 07CV2172 AJB, 2012 WL 3861946, at *4 (S.D. Cal. Sept. 5, 2012) (quoting *Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 956 (E.D. Cal. 1990)) (alteration in original). "Thus, in the Ninth Circuit, the availability of injunctive relief is a substantive issue and is therefore governed by state law." *Id.* (citing *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir .1988); *Fansler Found. v. Am. Realty Investors, Inc.*, No. CV–F–04–5285 LJO DLB, 2007 WL 1302742, *2 (E.D. Cal. May 2, 2007); *Sullivan*, 731 F. Supp. at 956). Accordingly, New York law applies in determining whether injunctive relief is appropriate. Regardless, the same general standard applies under

> a plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 729 (W.D.N.Y. 2011) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)); *accord Kaupp v. Church*, No. 10 Civ. 7559(JFK), 2011 WL 4357492, at *4 (S.D.N.Y. Sept. 19, 2011) (citing *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010)).

"[A]bsent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases . . . because ordinarily libels may be remedied by damages." *Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing *Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963)). Further, injunctive relief in defamation cases is disfavored because a permanent injunction constitutes a prior restraint on expression, raising a "heavy presumption" of infringing the defendant's rights under the First Amendment. *See id.* at 176–77. The granting of a mandatory injunction, as Plaintiffs seek here, is also "an extraordinary and drastic remedy." *Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *12–13 (N.Y. Sup. Ct. June 13, 2002) (citing *Times Square Stores Corp. v. Bernice Realty Co.*, 107 A.D.2d 677, 682 (N.Y. App. Div. 1985)), *aff'd*, 766 N.Y.S.2d 88 (N.Y. App. Div. 2003).

/ / /

/ / /

---

California law. *See, e.g.*, *Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1148 (2007), *as modified* (Apr. 26, 2007) ("[A]n injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment."); *id.* at 1162 ("[T]he injunction must be reversed in part because it is overly broad, but a properly limited injunction prohibiting defendant from repeating statements about plaintiff that were determined at trial to be defamatory would not violate defendant's right to free speech."). Therefore, the Court finds that its decision concerning Plaintiffs' request for injunctive relief would have been the same had the Court applied California substantive law.

## II.     Analysis

Plaintiffs assert that they are entitled to permanent injunctive relief because prior restraint is not an issue on the facts before the Court.  Am. 3d Supp. Br. at 3–4 (citing *NitGen Co. v. SecuGen Corp.*, C 04-02912 JW (RS), 2004 WL 2303929 (N.D. Cal. Oct. 12, 2004); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003); *Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, No. 09-CV-2324 JLS CAB, 2011 WL 6182423, at *17 (S.D. Cal. Dec. 13, 2011); *Lothschuetz v. Carpenter,* 898 F.2d 1200, 1208–09 (6th Cir. 1990)).  Plaintiffs also argue that the factors to be considered in assessing whether to grant injunctive relief favor the granting of a permanent injunction. *See id.* at 5–7.

In arguing that prior restraint is not an issue, Plaintiffs rely heavily on *Lothschuetz*, *supra*, a Sixth Circuit opinion.  *See* Am. 3d Supp. Br. at 4.  Plaintiffs cite no New York cases to support their argument.  *See id.* at 3–4.  However, based on this Court's own review of relevant authorities—some of which are cited by Plaintiffs elsewhere in their briefs—it does appear that New York courts have approved permanent injunctions against future libelous statements where the libel is "part of 'a sustained campaign,'" Eugene Volokh, *Anti-Libel Injunctions*, 168 U. Pa. L. Rev. 73, 141 (2019) (citations omitted), and where the libelous statements injure a business interest or other property right.  *See, e.g.*, *Rombom*, 2002 WL 1461890, at *13 (approving modified permanent injunction where "the statements made by defendants were calculated, in large part, to injure plaintiff's business, justifying the issuance of a mandatory injunction."); *Trojan Elec. & Mach. Co. v. Heusinger*, 557 N.Y.S.2d 756, 757–59 (N.Y. App. Div. 1990) (approving preliminary injunction against libel, reasoning: "While equity will not intervene to restrain the publication of words on a mere showing of falsity, it may intervene where restraint becomes essential to the preservation of a business or other property rights threatened by tortious conduct in which the words are merely an instrument of and incidental to the conduct") (citations omitted); *Bingham v. Struve*, 591 N.Y.S.2d 156, 158 (N.Y. App. Div. 1992) (approving preliminary injunction against allegedly defamatory speech that was

"capable of injuring plaintiff-husband's standing and reputation in all aspects of his personal and professional life, and of inflicting serious psychological and emotional damage to both plaintiffs, as well as to their family members"); *Ansonia Assocs. Ltd. P'ship v. Ansonia Tenants' Coal., Inc.*, 677 N.Y.S.2d 575, 576 (N.Y. App. Div. 1998) (affirming preliminary injunction where "defendants' conduct was not protected speech but merely an instrument of and incidental to wrongful conduct . . . , calculated to injure plaintiff's business") (citation omitted); *Dennis v. Napoli*, 49 N.Y.S.3d 652, 654 (N.Y. App. Div. 2017) (upholding preliminary injunction where the defendant's "unsolicited communications to plaintiff's professional colleagues, friends, and family about plaintiff's alleged sexual proclivities . . . cause injury to [the plaintiff's] reputation, jeopardize her employment, and otherwise unnecessarily intrude upon her right to privacy"); *cf. LoPresti v. Florio*, 899 N.Y.S.2d 10, 11 (N.Y. App. Div. 2010) (finding request for injunctive relief "was properly dismissed because there was no evidence of a sustained campaign to interfere with plaintiff's business that would justify a prior restraint on speech").

The Court previously found that Plaintiffs were entitled to default judgment on their claim for defamation and defamation per se, *see* ECF No. 97 at 14–16; accordingly, the Court has found that the statements alleged to be false in the FAC are defamatory. Further, it is clear from the evidence submitted by Plaintiffs that Defendant's False Statements have injured, and will continue to injure, Plaintiffs' business interests. *See, e.g.*, Weitsman Decl. ¶¶ 11–12, 20; Donnelly Decl. ¶¶ 6–10; *id.* Exs. 1–3; Johnson Decl. ¶¶ 6–13; *id.* Exs. 1–3; Supp. Weitsman Decl. ¶¶ 6, 8. Moreover, Defendant has been making these statements for more than four years, since October 2016, despite the initiation of this litigation and the issuance of an arrest warrant. *See* Am. 3d Supp. Br. at 5. Accordingly, it is clear that the False Statements are part of a sustained campaign to injure Plaintiffs' interests, including their business interests. Therefore, the Court agrees with Plaintiffs that, on the facts of this case, a permanent injunction would not be an impermissible prior restraint on First Amendment-protected speech.

/ / /

The Court further agrees that the balance of the equities supports the issuance of an injunction. The evidence establishes that Plaintiffs have suffered significant harm, not readily assigned a monetary value, in losing business and goodwill as a result of Defendant's statements. *See, e.g.*, Weitsman Decl. ¶¶ 11–12. The evidence also shows that Mr. Weitsman and his family have suffered non-monetary harm as a result of Defendant's actions. *See id.* ¶¶ 14–18, 21; *see also* Supp. Weitsman Decl. ¶¶ 6–8; 2d Supp. Weitsman Decl. ¶¶ 8–10, 13. It also is clear that Plaintiffs will continue to suffer this injury to their business, and that Mr. Weitsman and his family will continue to be harmed in non-compensable ways, unless and until this Court orders Defendant to stop, rendering monetary damages alone inadequate. This degree of harm far outweighs the hardships Defendant will suffer by imposition of a narrowly tailored injunction against speech already found to be defamatory. Further, the public interest would not be disserved by a narrowly tailored injunction in these circumstances. Accordingly, the Court agrees that Plaintiffs have made the necessary showing of entitlement to a permanent injunction. *See, e.g.*, *Rombom*, 2002 WL 1461890, at *12 (granting modified permanent injunction in defamation case given that "[p]laintiffs have made the requisite showing for a permanent injunction").

However, the Court finds that a number of modifications to Plaintiffs' Proposed Order are necessary in order for the requested relief to comply with the First Amendment. *See Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968) ("An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. . . . In other words, the order must be tailored as precisely as possible to the exact needs of the case.") (citation omitted).

First, Plaintiffs' Proposed Order applies to "Defendant and all those acting under his direction or control, including without limitation his past, current and future agents, servants, employees, and assignees, as well as all other persons in active concert or participation with Defendant who receive notice of this Order." Proposed Order at 5.

"There is no evidence in the record, however, to support a finding that anyone other than [Defendant] defamed [Plaintiffs], or that it is likely that [Defendant] will induce others to do so in the future.  Therefore, the injunction, to be valid, must be limited to prohibiting [Defendant] personally from repeating h[is] defamatory statements." *Balboa Island Vill. Inn*, 40 Cal. 4th at 1160.

Second, the Proposed Order prohibits not only the publication of the False Statements themselves, but also any "variation thereof." *See* Proposed Order at 8; *see also id.* at 5 & n.1 (noting that "this restriction includes the publication of any implications, videos, audio commentary, images or pictures that depict or convey the message associated with any False Statement"); *see also id.* at 7 (requiring removal of "any references, including any partial references, to a False Statement"); *see also id.* (requiring removal of "any same or similar false and misleading statements, comments, information, or references relative to Plaintiff"). As this Court has already granted Plaintiffs' request for a default judgment on their claim for defamation and defamation per se, and therefore found the statements alleged in the FAC libelous, the Court finds it proper to enjoin Plaintiff from publishing the libelous statements. Such statements are not protected by the First Amendment, and accordingly an injunction against their repetition would not be a prior restraint. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation . . . .") (citation omitted).

However, not all of the statements identified in the Proposed Order as False Statements are alleged in the FAC.[8] Based on the Court's careful review of the FAC and its exhibits, the Court believes the following statements from the Proposed Order have been determined to be libelous and properly may be enjoined:

---

[8] Granted, as the YouTube videos cited in the FAC are no longer available, the Court recognizes that it is possible that some of these statements are contained therein. If Plaintiffs submit evidence that some of the statements rejected by the Court appear in the YouTube videos, thus showing Defendant was on notice from the allegations of the FAC that these statements are allegedly defamatory, the Court, of course, will entertain a motion to amend the injunction.

    1.  Plaintiff is a "murderer";
    2.  Plaintiff conspired, assisted, helped, or aided in the murder of Michele Harris;
    3.  Plaintiff assisted, helped, or aided Calvin Harris or any other person in disposing of Michele Harris's body;
    4.  Plaintiff was paid money by Calvin Harris or other person in connection with murder or disappearance of Michele Harris;
    5.  Plaintiff assisted, helped or aided Calvin Harris or any other person from being found guilty, convicted, arrested, detained, liable, responsible, and/or suspected of murdering Michele Harris;
    6.  Plaintiff's equipment was used to dispose of Michele Harris' body;
    7.  Plaintiff was involved in the disappearance of Michele Harris;
    8.  Plaintiff sold or sells illegal drugs;
    9.  Plaintiff is or has been involved with Joaquín "El Chapo" Guzmán;
    10. Plaintiff engaged or engages in money laundering;
    . . .
    15. Plaintiff has raped one or more people . . .

Proposed Order at 5–6. Accordingly, the following statements, which do not appear in the FAC, were not adjudged libelous in the Court's February 14, 2020 Order:

    11. Plaintiff bribes or have bribed one or more government officials;
    12. Plaintiff is or has been involved with covering up the death of Michael Burke;
    13. Plaintiff has employed or does employ mostly pedophiles;
    14. Plaintiff fooled the Environmental Protection Agency ("EPA") by removing two feet of contaminated soil at the Jamestown Yard . . . .

Proposed Order at 6. Accordingly, to enjoin these statements might well be an unconstitutional prior restraint, and the Court therefore declines to extend the injunction to these statements.

    Moreover, the Court is concerned that enjoining variations of, depictions of, or statements that "convey the message" of the False Statements, or statements that "partial[ly] refer[]" to the False Statements, is a slippery slope that would potentially result

in an unconstitutional prior restraint.  For example, Plaintiffs provide the exemplary statement: "'Did the #VicePresident of @UpstateShred admit that he is tracking my IP address? #Binghamton @nyspolice @WBNG12News #CrimeNews #CalHarris." *Id.* at 7 n.2.  However, none of the False Statements allege that Plaintiffs track Defendant's Internet Protocol address.  Thus, the Court does not agree with Plaintiffs that this statement falls within the scope of the properly enjoined statements.  And, while the Court is disturbed by Defendant's posting of "images or photos of Weitsman and/or his family, including his wife and their minor child," *id.* at 8, the Court does not believe the posting of personal images alone falls within the scope of the False Statements such that this act is properly subject to the requested injunctive relief.  *See, e.g.*, *Brummer v. Wey*, 89 N.Y.S.3d 11, 14 (N.Y. App. Div. 2018) (refusing to enjoin speech that, "as offensive as it is, cannot reasonably be construed as truly threatening or inciting violence against plaintiff").  With a heavy heart, the Court must conclude that it cannot extend the injunction to statements other than the False Statements themselves.

Third, the Court has concerns about expanding the injunction beyond the parties to this action.  Plaintiffs' Proposed Order extends not just to statements about "any Plaintiff," but also to statements concerning "any business entity related thereto."  *See* Proposed Order at 8.  But Plaintiffs have not supported this request with evidence that Defendant has made, or has threatened to make, similar statements about any other entities affiliated with Plaintiffs.  Accordingly, the Court declines to phrase the injunction to extend to statements about any related business entities beyond the named Plaintiffs.

Relatedly, the Court has concerns about ordering third parties, including Twitter, Facebook, Instagram, and YouTube, to take action against Defendant should he fail to remove the material in accordance with the injunction.  *See* Proposed Order at 8–9; *see also id.* at 9–10 (providing that the Court requests that "Google, Yahoo!, Bing, Facebook, Instagram, Twitter, YouTube, and other websites with the same or similar defamatory content about Plaintiffs remove all associated webpages and URLs from their respective search indexes and websites").  Plaintiffs can request that these third parties voluntarily

remove the material in question and/or suspend Defendant's accounts, *see, e.g.*, Not. of Lodgment at 2, and, should Defendant fail to comply with the terms of the injunction, they can return to this Court and seek to hold Defendant in contempt or sanction him. However, the Court will not compel third parties who have not appeared in this matter to act. Any mandatory injunction is extraordinary, *see, e.g.*, *Times Square Stores Corp.*, 484 N.Y.S.2d at 596 (noting that, in New York, "a mandatory injunction compelling a party to affirmatively act [is] an 'extraordinary' and 'drastic' remedy") (citation omitted), and Plaintiffs have cited no authority indicating that such a remedy is appropriate as to parties who are not alleged to have committed any wrongful acts themselves and who have not had an opportunity to oppose the requested relief. During the November 5, 2020 hearing, Plaintiffs' counsel indicated that the Communications Decency Act of 1996 ("CDA") may support this request. However, the Court finds that the CDA, in fact, cuts against ordering a third party who has not appeared in the action to remove defamatory speech. *See, e.g.*, *Hassell v. Bird*, 5 Cal. 5th 522, 541 (2018) ("Even though plaintiffs did not name Yelp as a defendant, their action ultimately treats it as 'the publisher or speaker of . . . information provided by another information content provider.' With the removal order, plaintiffs seek to overrule Yelp's decision to publish the three challenged reviews. Where, as here, an Internet intermediary's relevant conduct in a defamation case goes no further than the mere act of publication—including a refusal to depublish upon demand, after a subsequent finding that the published content is libelous—section 230 prohibits this kind of directive.") (citing 47 U.S.C. § 230(c)(1); *Barrett v. Rosenthal*, 40 Cal. 4th 33, 48, 53 (2006); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *Medytox Sols., Inc. v. Investorshub.com, Inc.*, 152 So. 3d 727, 731 (Fla. Dist. Ct. App. 2014)), *cert. denied sub nom. Hassell v. Yelp, Inc.*, 139 S. Ct. 940, 203 L. Ed. 2d 131 (2019). The Court fervently hopes that the third parties in question will voluntarily remove the posts in question given the Court's determination that the posts are defamatory and the Court's injunction against Defendant's making or continuing to make the statements in question, but the Court cannot order the third parties to do so.

19-CV-461 JLS (AHG)

Finally, the Court is concerned that the Proposed Order requires Defendant to take actions beyond his control.  For example, the definition of "Forums" in the Proposed Order seems overbroad.  While Defendant presumably can easily delete his own posts made on his own social media accounts, it is not clear to the Court that Defendant has the ability to remove the False Statements from, for example, "search engines."  *See* Proposed Order at 6.  Moreover, "Forums" includes "lists," and it is unclear what, precisely, that term encompasses.  Further, it is not clear what Defendant may have "caused to be published" (particularly given that, as noted *supra* at 28–29, there are no allegations that Defendant has engaged or induced others to defame Plaintiffs), or whether Defendant has control over the removal of such content.  *See* Proposed Order at 7.  Accordingly, the Court will revise the Proposed Order to only require Defendant to remove those libelous statements he has published himself and which are within his own control.

In light of the foregoing, the Court **GRANTS IN PART** Plaintiffs' request for permanent injunctive relief, as set forth below.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** Plaintiffs' request for monetary damages.  Specifically, the Court **GRANTS** Plaintiffs' request for "actual" damages in the amount of $349,797.30; **GRANTS IN PART** Plaintiffs' request for general damages, awarding them the revised sum of $600,000; and **GRANTS IN PART** Plaintiffs' request for punitive damages, awarding them the reduced amount of $50,000, for a total damages award of $999,797.30.

The Court also **GRANTS IN PART** Plaintiffs' request for permanent injunctive relief, as follows:

1.    Defendant **SHALL** be permanently restrained and enjoined from libelously publishing, via the Internet or any other medium, any of the following false and defamatory statements (the "False Statements"): (1) that any Plaintiff is a "murderer"; (2) that any Plaintiff conspired, assisted, helped, or aided in the murder of Michele Harris; (3) that any Plaintiff assisted, helped, or aided Calvin Harris or any other person in disposing of

Michele Harris's body; (4) that any Plaintiff was paid money by Calvin Harris or any other person in connection with the murder or disappearance of Michele Harris; (5) that any Plaintiff assisted, helped, or aided Calvin Harris or any other person from being found guilty, convicted, arrested, detained, liable, responsible, and/or suspected of murdering Michele Harris; (6) that Plaintiffs' equipment was used to dispose of Michele Harris' body; (7) that any Plaintiff was involved in the disappearance of Michele Harris; (8) that any Plaintiff sold or sells illegal drugs; (9) that any Plaintiff is or has been involved with Joaquín "El Chapo" Guzmán; (10) that any Plaintiff engaged or engages in money laundering; and (11) that any Plaintiff has raped one or more people.

2.     Within <u>fourteen (14) days</u> of the date of the electronic docketing of this Order, Defendant **SHALL** remove from all websites, forums, blogs, social media websites, and/or other forums of mass communication any and all False Statements pertaining to any Plaintiff that Defendant has published.

3.     In the event Defendant fails to comply with this Order, he **MAY** be subject to contempt and/or sanctions.

4.     The Court **RETAINS** jurisdiction to enforce this judgment.

Given that this Order disposes of all remaining issues in this matter, the Clerk of the Court **SHALL ENTER JUDGMENT** in favor of Plaintiffs and **CLOSE** the file.

**IT IS SO ORDERED.**

Dated:  November 20, 2020

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge